## Tharp v. Commonwealth.
(Decided May 4, 1937.)

WILLIAMS & ALLEN for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Shelt Tharp and his son, Mowbray Tharp, were jointly indicted for the murder of John Mitchell O'Connor. They were charged as principals, and also as aiders and abettors. On his separate trial Shelt Tharp was convicted of manslaughter and his punishment fixed at two years' imprisonment. The case is before us for review.

The homicide occurred early on the morning of June 23, 1936, about three miles from the city of Jackson on what is known as Stray branch, which empties into the Kentucky river about two miles above and on the opposite side of Jackson. Appellant and his family, consisting of his wife and several small children, lived about a mile up Stray branch. His son, Mowbray Tharp, is about twenty years of age. The deceased John Mitchell O'Connor, lived about 350 or 400 yards above the appellant on a small branch which runs into the main branch near appellant's barn. Appellant's dwelling house is near the main branch and about 50 yards from and below the barn. There is a path which passes near appellant's barn, and goes on up the small branch to the home of the deceased. At a point in this path about 75 or 100 yards from the barn, the killing occurred.

In view of the contention that the evidence was not sufficient to take the case to the jury, or to sustain the verdict, we shall give the material portions of the evidence. According to Nancy O'Connor, the widow of the deceased, her husband left home early, intending to go to town. After he had been gone three or four minutes she heard a shot fired and her husband calling for her. She went down the path and found her husband sitting over in the branch about 40 or 50 yards from appellant's barn. As she approached her husband she saw appellant running from the scene with a shotgun in his hand. On reaching her husband she said: "Lord, have mercy, John Mitchell, what's the matter?" He said: "I'm killed. Shelt Tharp has killed me." Her husband was shot in the leg and she could see the blood on his breeches. She took her husband by the arm, raised him on his feet, and led him up the hill. When she got him up in the path that leads toward her home, she heard a "blundering through the sprouts," and saw Mowbray Tharp coming through the hill. Mowbray laid his gun up by the side of a sapling and started to shoot.

John Mitchell threw up his hand and said: "Lord, have mercy, don't shoot, I am killed." She let loose of John Mitchell and started up the hill toward Mowbray saying: "Lord have mercy, don't shoot." Mowbray fired that shot, took his gun down, put in another shell, and fired again. Her husband sank down on his knees, pitched over, and fell over the hill. Blevens Potter, who lives across the branch from appellant, heard three shots. He was familiar with the report of guns and could distinguish one gun from another. In his opinion the shots were fired from a shotgun. It was four or five minutes after the first shot was fired before the next two shots were fired. He and the coroner made a search and found some shotgun wadding coming from toward the tree. He also found a cartridge hull. They found some blood down in the branch 15 or 20 steps from the barn lot. The trail of blood led up to where the body was found. James T. Goff, the coroner of Breathitt county, and a gunsmith, was seated in his office on the morning of the homicide. Between 7:30 and 8 o'clock appellant came to his office and told him that he guessed he would be needed up the branch. He asked appellant: "Why?" And appellant said: "I guess my boy, Mowbray, killed John Mitchell O'Connor." That was about half an hour before he learned that O'Connor had been killed. Later on Jess Oaks notified him that it was a fact. He then started to the scene of the homicide. He rode to the mouth of Kings branch in a truck, and walked on. Right opposite the body on the hill he found some shotgun wadding. On the right-hand side going up he found an empty shell, a 12-gauge shell, near the poplar tree, which was about 25 or 30 feet from the body. One end of the wadding had No. 4 shot on it. They found tracks, one coming toward the tree and one leading away from the tree. The track leading to the tree came from appellant's home, and the track leaving the tree led to appellant's home. They also found some shotgun wadding in the barn lot, and some just outside the lot. On the cap it said: "Buck shot No. 2." The blood was about 10 feet from the barn lot fence. He helped undress the body and found wounds in front in the lower part of his bowels, and around his thighs. The wounds were caused by buckshot. There were between 15 and 17 shots. The wounds were sufficient to produce death. He also found one shot in the center of the neck

and some No. 4 shots all around his back. One load of buckshots went through and hit his arm. Leonard Potter, son of Blevins Potter, heard the shots. There was one shot, and four or five minutes later two other shots were fired. They sounded like a 12-gauge shotgun. He saw Mowbray Tharp coming from appellant's home about 6 o'clock, going in the direction of town. Jake Prater was working on the schoolhouse at Stray branch, about 400 or 500 yards from appellant's home. On the morning of the homicide he was with Chester Hays, Pierce Vires, and Ed Collins. They met appellant 400 or 500 yards "this side of his house down the branch." He never heard any shooting after meeting appellant. Ed Collins, Chester Hays, and Pierce Vires testified to the same effect. Charlie Flinchum testified that he and appellant were talking about John Mitchell O'Connor. Appellant said that if he (O'Connor) fooled with him he would put him out of business. Earl Flinchum testified that appellant, in speaking to him about John Mitchell O'Connor, said: "I won't fool with him, and if he fools with me I will kill him." Gilbert Robinson, who lived about 300 or 400 yards below appellant and was renting a cane patch from appellant, said that after the other trial appellant came to him and told him if he would swear that he heard a pistol fired he would give him the rent on the cane patch, 15 gallons of molasses. Pete Robinson saw appellant on the Sunday morning before the homicide, and appellant told him that the deceased had gotten a warrant for him for putting his cow up, and added: "I am not going to give John Mitchell no chance."

On the other hand, appellant testified as follows: He left home that morning between 5 and 5:30, and started for Jackson. When he left, his son, Mowbray, was standing with his right arm around the porch post. On reaching the hog lot he "hollered" to Mowbray and told him that if he hoed corn to hoe on the upper end where it was weediest. He never saw Mowbray any more that morning until he saw him in Jackson with Jess Oaks. It must have been near a quarter to 7 or 7 o'clock. On his way to Jackson he saw Sam Henry Oaks across the branch at the far end of his walk log, and talked with him five or ten minutes. After separating from Sam Henry Oaks, he met Charlie Robinson and Gilbert Robinson 300 or 400 yards below his house.

Afterward he met Donald Keith and Mrs. Robinson. After leaving them he got with Clarence Fouts at the mouth of Stray branch. They came on down to the mouth of Lick branch. He stopped and talked with his sister. Before he got with his sister he remembered meeting Pierce Vires, Ed Collins, and Jake Prater at the lower end of Charlie Robinson's garden. After that he met two women, Eva Gabbard and a Johnson girl, near the mouth of Lick branch. He also saw Tom Ratcliffe, Andrew Lynch, and G. B. Dulaney. He did not go over to Jim Goff's shop when he got into Jackson. He did not know or have any knowledge of any trouble occurring up there at his home. He never learned of Mitchell O'Connor's death until he was there in Jackson in front of the magistrate's office. Jess Oaks gave him the information. After getting the information he went on home. He never had anything to do with the killing of John Mitchell O'Connor, nor did he know that his son was going to kill him. He was not in or about his barn just prior to the killing. There was only one shotgun at his home, and that belonged to his boy. He did not make any statement to Charles Flinchum or Earl Flinchum in regard to O'Connor. On cross-examination he stated that he had put up O'Connor's cow a few days before the killing, and O'Connor had come down and had a warrant issued for him. Mowbray Tharp testified as follows: He was between 18 and 20 years of age. He killed John Mitchell O'Connor. His father was not near or present at the time and knew nothing about it. His father had never advised or talked to him about the killing. He did the killing with his own gun, a 12-gauge shotgun. He fired three shots. The last time he saw his father was down at the walk log talking to Sam Henry Oaks. That was between 5 and 5:30 in the morning. After the shooting he came in and gave himself up. As he left home he saw Alberta Potter at her home. In going to Jackson he ran part of the way and walked pretty fast the rest of the way. The first officer he found was Jess Oaks. He told Jess what he had done. He saw his father in front of the magistrate's office, in Jackson, and his father was then told what had happened. It was then between 8 and 8:30 o'clock. On cross-examination he testified that, when he fired the first shot, he was "somewhere 15 or 20 steps yon side of the barn." O'Connor was at the upper side

of the road above him. He used a 12-gauge single-barrel shotgun. At the time he shot O'Connor, O'Connor raised up and shot at him with some kind of an army gun, 41 Swift. They both fired about the same time. He then ran up the hill, and O'Connor ran over the bank into the hollow. O'Connor then ran after him. O'Connor's wife grabbed him and they scuffled there until O'Connor got within 25 steps of him. He slung her loose and shot O'Connor. Afterward the wife grabbed the gun, threw it on him, and he shot at her. G. B. Dulaney saw appellant in Jackson about 6:45, or a few minutes later, on the morning of the homicide. According to Tom Ratcliffe appellant got to his house about 6:15, and he came to town with appellant. Appellant stopped at Andrew Lynch's, Ed Caldwell's store, and Bob Johnson's. When they reached Jackson appellant did not stop at Jim Goff's shop. Appellant did stop and talk to old man G. B. Dulaney. When he first saw appellant there was nothing unusual about him, but he was very much excited when the news came that his boy had killed the deceased. According to Bennie Keith, he was with appellant at Price Sewell's store in south Jackson. They saw Mr. Goff, and appellant said: "Hello, Mr. Goff." It was then about 7 o'clock. Brack Thompson saw appellant at Kings branch about 6:15 that morning. Sam Henry Oaks, who lived about three-quarters of a mile below appellant, saw appellant at his home about 5 or a little after 5. Appellant said he was going to town. While he was down there he did not hear any shooting, or any one crying. Alberta Potter heard the shooting. Before the shooting she saw appellant going toward town. After the shooting she saw Mowbray Tharp going toward town. Lige Gross saw Mrs. O'Connor shortly after the shooting and she said: "Mowbray Tharp has shot John Mitchell." His wife was present and she testified to the same effect. Mrs. Brack Thompson testified that Mrs. O'Connor said she did not know how it happened, and that her husband said that Mowbray shot him. Alfred Thompson heard Mrs. O'Connor tell his mother that Mowbray Tharp killed her husband. Estill Potter and Ed Potter were at appellant's barn the Saturday before the homicide and were shooting across the fence at a can. Other witnesses testified that they saw appellant in Jackson early on the morning of the homicide. In rebuttal Jess Oaks, who arrested Mowbray Tharp, testified that Mowbray

told him that at the time he shot John Mitchell, Mitchell tried to pull a pistol on him. Eva Gabbard met appellant halfway between Lick branch and Stray branch. After she met appellant she saw Mowbray Tharp at the mouth of Stray branch. She learned from him that O'Connor had been killed, and Mowbray stated that O'Connor was attempting to pull a pistol on him. Cordelia Johnson saw appellant about 300 or 350 yards below Stray branch. She also saw Mowbray Tharp at the mouth of Stray branch. It was then around 6 o'clock. Donald Keith saw appellant, and about five minutes later saw Mowbray going to town in the same direction. Mrs. O'Connor denied making the statements attributed to her by the witnesses for the defense, and she was corroborated by other witnesses.

Analyzing the foregoing evidence, we have on the one hand the evidence of appellant and his son, Mowbray, that appellant had nothing whatever to do with the homicide, but had left for Jackson before the homicide occurred; the evidence that Mrs. O'Connor, the main prosecuting witness, never mentioned the fact that appellant shot her husband, but stated to certain witnesses that Mowbray shot him; and the further fact that appellant's evidence that he had left for Jackson before the homicide occurred was corroborated by the evidence of certain witnesses who saw him on the way. On the other hand, we have the fact that the deceased had had a warrant issued for the arrest of appellant for taking up his cow, and that appellant had made threats against the deceased; that immediately after the shooting Mrs. O'Connor saw appellant going toward his home with his shotgun in his hand, and that her husband stated to her that appellant had killed him; that appellant and Mowbray were seen by several witnesses to be not more than four or five minutes apart en route to Jackson; that between 7 and 7:30 appellant told the coroner that his son, Mowbray, had killed O'Connor; that several witnesses who met appellant on his way to Jackson all testified that they heard no shooting after they saw appellant, and that the buckshot which evidently came from the gun when it was first fired, penetrated the bowels of the deceased and caused wounds sufficient to bring about his death. Clearly the evidence is not only sufficient to take the case to the jury, but to sustain the verdict.

Nor do we find any merit in the contention that the statement of the deceased that appellant had killed him was inadmissible as a dying declaration. Not only did the deceased himself state that he had been killed by appellant, but the evidence tends to show that he had already been fatally wounded. This was sufficient to show that he had given up all hope of recovery, even though he managed, with the assistance of his wife, to walk a few yards, and was afterward shot again. Smith v. Commonwealth, 229 Ky. 159, 16 S. W. (2d) 775; Burnett v. Commonwealth, 200 Ky. 765, 255 S. W. 544.

Lastly, it is insisted that there was no evidence authorizing appellant's conviction either as principal, or as aider and abettor of his son. The first contention has already been disposed of. With respect to the second contention we have the following situation: Appellant is the one whom the deceased had arrested, and who had threatened the deceased. The deceased stated that appellant killed him, and appellant was seen by the wife of the deceased running toward his home immediately after the shooting. Appellant's son then appears on the scene and fires two shots with the same gun that appellant had used. It is hardly probable that they acted separately and independently of each other. On the contrary, it is but a fair inference from all the circumstances that appellant and his son acted in concert, and that appellant delivered the gun to his son for the purpose of finishing the job that he had set on foot.

On the whole we find no error in the record prejudicial to appellant's substantial rights.

Judgment affirmed.